## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DREW WARREN, | : | Civil No. 1:22-CV-01309 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| DONEGAL MUTUAL INSURANCE COMPANY and PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

### MEMORANDUM

Plaintiff brought this lawsuit against both his insurer and his parents' insurer seeking underinsured motorist benefits to which he claims he is entitled following an accident with an underinsured motorist. Currently before the court is Defendants' motion for summary judgment. For the reasons that follow, the court will grant Defendants' motion.

### BACKGROUND

**A. Accident**

On September 3, 2021, Plaintiff, Drew Warren ("Warren"), was vacationing with his family in Avalon, New Jersey.[1] (Doc. 58, ¶ 6.) Late that night, Warren

---

[1] Defendants' statement of material fact states that the date of the incident was September 3, 2023. (Doc. 58, ¶ 6). Warren admitted this fact. (Doc. 62, ¶ 6.) This was clearly an oversight, considering this case has been pending since 2022. The correct date of the incident is found in the complaint and the police report of the incident. (Doc. 1, ¶ 19; Doc. 58-3, p. 14.)

was biking down 25th Street in Avalon towards Ocean Drive.  (*See id.* ¶ 14.)  At the intersection of 25th Street and Ocean Drive, Warren's bicycle collided with a van driven by Zulqarnain Saeed ("Saeed"), who was traveling on Ocean Drive. (Doc. 58-3, p. 11.)  The collision involved such force that the van's passenger window shattered.  (*See* Doc. 58, ¶ 37.)  When law enforcement first responded to the intersection, Warren was lying unconscious and unresponsive about 10 feet away from his bicycle, which was in the intersection.  (*Id.* ¶¶ 30–31.)  Warren was transported for medical care, *id.* ¶ 33, and allegedly suffered a variety of severe injuries, such as rib, hand, and maxilla fractures, spleen laceration, acute respiratory failure, and bilateral pneumothoraces.  (Doc. 1, ¶ 23.)

Patrolman Nicholas Bradley ("Patrolman Brady") and Detective Sergeant Matthew Sykes ("Detective Sergeant Sykes") of the Avalon Police Department, and Detective Jennifer Falciani ("Detective Falciani") of the Cape May County Prosecutor's Office, among others, responded to the scene and performed an investigation.  (*See* Doc. 58-3, pp. 11–29.)[2]  The investigation focused on several matters relevant here.

Law enforcement investigated Saeed's potential fault in the accident. Patrolman Brady spoke with Saeed, who told police that he believed he had the green light at the intersection and was traveling at about 15 to 20 miles per hour.

---

[2] For ease of reference, the court uses the page numbers from the CM/ECF header.

(*Id.* at 11–12.)[3]  Patrolman Brady also noted that he "did not detect any odor of an alcohol [sic] beverage emitting from Saeed" and that Saeed "passed standard field sobriety tests."  (*Id.* at 12.)  Detective Sergeant Sykes and Patrolman Brady also obtained Saeed's consent to search his vehicle, which yielded "no illegal contraband."  (*Id.* at 14.)  Saeed also voluntarily agreed to go to the hospital to provide a blood sample for testing.  (*Id.* at 14–15.)  The results of that testing, according to Detective Falciani, showed no signs of "ethyl alcohol" or "impairing drugs" in Saeed's blood.  (*Id.* at 21.)  Following Saeed's blood test, Detective Sergeant Sykes and Detective Falciani interviewed Saeed at the Avalon Police Department.  (*Id.* at 18.)  Prior to the interview, Saeed consented to searches of his two mobile phones.  (*Id.* at 15, 19.)  Those searches found that Saeed did not use his phone to text or call around the time of the accident, other than to call 911 to report the accident.  (*Id.* at 15, 21.)  During the interview, Saeed reported that "he did not see anything as he was approaching the intersection, nor did he see anything as he travelled through the intersection."  (*Id.* at 19.)  He again reported that he believed he had the green light and traveled through the intersection at "less than 25" miles per hour.  (*Id.*)

---

[3] The parties agree that the police reports misidentified Saeed as "Zulqarnai Saeed."  (Doc. 58-3, ¶ 33 n.2; Doc. 62, ¶ 33.)

The investigation also focused on determining who had the right of way at the time of the collision.  Relevant to this issue, Patrolman Brady and Detective Sergeant Sykes spoke with Robert Scully ("Scully"), an individual who was near the intersection at the time of the accident.  Scully reported to the police that he was walking on Ocean Drive near 26th Street when he heard a loud noise.  (*Id.* at 12.)  Traffic was moving, according to Scully, north and south on Ocean Drive when he heard the loud noise.  (*Id.* at 12.)  Moreover, Detective Falciani noted that "the traffic light at the intersection of 25th Street and Ocean Drive is controlled by a sensor and never turned red for traffic on Ocean Drive during [her] time on scene."  (*Id.* at 19–20.)

Based on all of these investigative findings, Saeed was not cited for any violations, Doc. 58, ¶ 44, and Falciani concluded: "The cause of this crash can be directly attributed to the actions of Bicyclist Warren, specifically by running the red light at the intersection of 25th Street and Ocean Drive and colliding with [Saeed's van] in a perpendicular manner."  (Doc. 58-3, p. 21.)

**B. Warren's Lawsuit Against Saeed**

On July 29, 2021, Warren sued Saeed in the United States District Court for the District of New Jersey.[4]  (*See* Doc. 58, ¶ 4.)  Warren settled that case in exchange for $25,000, which allegedly was Saeed's policy limit.  (Doc. 58-1;

---

[4] *See generally Warren v. Saeed*, No. 1:21-CV-20757 (D.N.J. filed Dec. 30, 2021).

Stipulation of Dismissal, *Warren v. Saeed*, No. 1:s (D.N.J. July 29, 2022), ECF. No. 17.)  The release Warren signed in connection with the settlement expressly stated that the release did not "constitute an admission on behalf of any party . . . and that liability herewith is more specifically denied."  (Doc. 58-1, p.1.)

### C. Instant Lawsuit

Defendant Donegal Mutual Insurance Company ("Donegal") is Warren's parents' auto-insurance provider.  (Doc. 58, ¶ 2.)  Defendant Pennsylvania National Mutual Casualty Insurance Company ("Penn National") is Warren's own auto-insurance provider.  (*Id.*)  Warren alleges that the Donegal policy provides underinsured motorist coverage with a total limit of $600,000 per person.  (Doc. 1, ¶ 12.)  Warren further alleges that the Penn National policy provides up to $100,000 per person in underinsured motorist coverage.  (*Id.* ¶ 16.)  On June 16, 2022, after settling the lawsuit against Saeed, Warren allegedly sent demand letters to Defendants for the limit of the policies' underinsured motorists coverage.  (*See id.* ¶¶ 30–32, 37–39.)  On August, 19, 2022, Warren filed the instant lawsuit due to Defendants' alleged failure to respond to his demands.  (*Id.* ¶¶ 33–35, 40–42.) Warren claims that he is entitled to underinsured motorist coverage under both policies.[5]

---

[5] Warren alleges that he is entitled to underinsured motorist coverage under his parents' policy, because he was "a residential relative" at the time of the accident.  (*See* Doc. 1, ¶ 11.)

This case proceeded through fact discovery after the court denied Defendants' motion to dismiss. *Warren v. Donegal Mut. Ins. Co.*, No. 1:22-CV-01309, 2023 WL 3260727 (M.D. Pa. May 4, 2023). Following fact discovery, Defendants jointly filed the instant motion for summary judgment along with a brief in support. (Docs. 56 & 57.) In turn, Warren filed a brief in opposition, and Defendants responded with a reply brief. (Docs. 63 & 64.) In addition to this briefing, the court has reviewed Defendants' statement of material facts, Warren's answer to Defendants' statement, as well as the exhibits attached thereto. (Doc. 58 & 62.) Defendants' motion is now ripe for review.

### JURISDICTION

This is a lawsuit between citizens of different states and concerns an amount in controversy exceeding $75,000. Therefore, this court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.

### STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "A

dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or

suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

### A. Pennsylvania law applies to the issue presented in Defendants' motion.

Before turning to the merits, the court must first resolve the parties' dispute as to whether New Jersey or Pennsylvania law governs the issue raised by the instant motion.

This court in exercising diversity jurisdiction "must apply state substantive law and federal procedural law." *Schmigel v. Uchal*, 800 F.3d 113, 119 (3d Cir. 2015) (quoting *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000)); *accord Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). When faced with a

choice-of-law problem, "[a] federal court sitting in diversity applies the choice-of-law rules of the forum state." *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 206 (3d Cir. 2013). Accordingly, the court will apply Pennsylvania's choice-of-law rules.

Defendants argue that Pennsylvania law applies, because there is no "true conflict" between New Jersey law and Pennsylvania law with respect to the issues presented here and, thus, the law of the forum applies. (Doc. 64, pp. 3–7.) Warren contends that New Jersey law governs this action, because his claims accrued in New Jersey. (Doc. 63, pp. 10–11.) Warren is mistaken as to what Pennsylvania's choice-of-law analysis requires. The fact that the accident occurred in New Jersey is not dispositive. Pennsylvania long ago "abandoned the traditional *lex loci delicti* conflicts rule in which the law of the place of the wrong governed the substantive rights and liabilities of the parties." *Garcia v. Plaza Oldsmobile Ltd.*, 421 F.3d 216, 219 (3d Cir. 2005) (citing *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805 (Pa. 1964)).

Instead, Pennsylvania's choice-of-law rules involve two steps. The court must "first consider whether a 'true conflict' exists between the two states." *Melmark, Inc. v. Schutt ex rel. Schutt*, 206 A.3d 1096, 1104 (Pa. 2019). If the states' laws do not differ such that either's application would result in the same outcome, then there is no conflict and no further analysis is necessary.

9

*Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 229–30 (3d Cir. 2007); *Holtec Int'l v. ARC Machs., Inc.*, 492 F. Supp. 3d 430, 438 (W.D. Pa. 2020). "If a true conflict exists, the [c]ourt must then determine which state has the 'greater interest in the application of its law.'" *Hammersmith*, 480 F.3d at 231 (quoting *Cipolla v. Shapoksa*, 267 A.2d 854, 856 (Pa. 1970)).

Choice of law determinations are made on an issue-by-issue basis. *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006); *L.R. McCoy & Co. v. Beiler*, Civil No. 10-1301, 2011 WL 925410, at *3 (E.D. Pa. Mar. 16, 2011); *Fleet Nat'l Bank v. Boyle*, No. 04CV1277LDD, 2005 WL 2455673, at *7 (E.D. Pa. Sept. 12, 2005). Therefore, the court must determine which state's law applies to the issues raised by the Defendants' motion for summary judgment.

Warren's complaint contains two counts, both styled "underinsured-motorist benefits." (Doc. 1, ¶¶ 43–62.) He alleges that he "is legally entitled to recover" on these claims "because the accident in question resulted solely from the negligence and carelessness of" Saeed. (*Id.* ¶¶ 50, 60). Warren and Defendants have neither proffered the two insurance policies at issue nor explicitly explained when Warren is entitled to underinsured motorist coverage under the terms of the policies.[6]

---

[6] The contractual language of an insurance policy is ordinarily an important consideration in cases like this one. *See Pempkowski v. State Farm Mut. Auto. Ins. Co.*, 678 A.2d 398, 402 n.3 (Pa. Super. Ct. 1996) (quoting *Ins. Co. of the State of Pa. v. Hampton*, 657 A.2d 976, 979 (Pa. 1995)) ("The Pennsylvania courts have allowed uninsured and underinsured motorist coverage to be restricted in certain circumstances by the clear and express terms of a policy.")

Nevertheless, the parties seemingly agree that Warren is only entitled to underinsured-motorist coverage under the two policies if Saeed negligently caused the accident.

The primary issue before the court, therefore, is whether Warren has presented sufficient evidence of Saeed's alleged negligence such that Defendants' motion for summary judgment should be denied. There is no true conflict on this issue. Because the elements of negligence are the same under New Jersey and Pennsylvania law, this issue has no impact on the outcome of Defendants' summary judgment motion. *Compare Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 980 A.2d 502, 506 (Pa. 2009) (explaining that proving negligence under Pennsylvania law requires "establish[ing] the defendant owed a duty of care to the plaintiff, that duty was breached, the breach resulted in the plaintiff's injury, and the plaintiff suffered an actual loss or damages"), *with Townsend v. Pierre*, 110 A.3d 52, 61 (N.J. 2015) (quoting *Polzo v. County of Essex*, 960 A.2d 375, 384 (N.J. 2008)) ("To sustain a cause of action for negligence [under New Jersey law], a plaintiff must establish four elements: (1) a duty of care, (2) a breach of that duty; (3) proximate cause; and (4) actual damages." (internal quotation marks omitted)).

Having found no conflict between Pennsylvania and New Jersey law as to the elements of negligence, the court's analysis need not go further. Pennsylvania law will apply as to whether Warren has provided sufficient evidence to support

his allegations of negligence. As becomes clear below, this is the only issue for which a choice-of-law decision is necessary.

**B. Defendants are entitled to judgment as a matter of law.**

As noted above, to establish that Saeed was negligent, Warren must prove "(1) [Saeed] was under a 'legally recognized duty or obligation' to act in a certain way; (2) [Saeed] breached that duty; (3) there was a causal connection between that breach and the plaintiff's injury; and (4) the plaintiff experienced an actual injury or damage." *Warren*, 2023 WL 3260727, at *6. Warren alleged that Saeed acted negligently by, *inter alia*, "[f]ailing to observe and yield to the right of way of other motorists and pedestrians," "[o]perating [his] motor vehicle improperly under the circumstances," and "[o]perating [his] motor vehicle in violation of the Motor Vehicle Code." (Doc. 1, ¶¶ 51, 61). However, in opposing summary judgment, Warren clarifies that his claims are premised only on two theories of negligence. The first theory is that Saeed ran a red light at the intersection of 25th Street and Ocean Drive. (*See* Doc. 63, pp. 5–10.) The second is that Saeed was negligent, irrespective of whether he had a green or red light, because he could have and should have seen Warren approaching the intersection, yet did not avoid the collision. (*See id.* at 10–12.) Defendants argue that Warren has failed to provide sufficient evidence to support either of these theories. (Doc. 57, pp. 7–15; Doc. 64, p. 8.) The court agrees with Defendants.

12

### 1. There is no genuine issue of material fact as to who had the right of way at the time of the accident.

Defendants proffer evidence showing that Saeed had a green light as he traveled on Ocean Drive through the 25th-Street intersection. First, Saeed himself told police the night of the accident, both at the scene and at a subsequent interview, that he believed he had a green light. (Doc. 58-3, pp. 11, 15, 19). Saeed similarly testified at depositions both in this case and in the underlying action in the District of New Jersey that he had a green light. (Doc. 58-6, p. 8; Doc. 58-7, p. 9.)

Defendants also point to Detective Falciani's conclusion that the traffic light was sensor-controlled. In her police report, Detective Falciani stated, "the traffic light at the intersection of 25th Street and Ocean Drive is controlled by a sensor and never turned red for traffic on Ocean Drive during [her] time on scene." (Doc. 58-3, pp. 19–20.) Detective Falciani explained at her deposition that she came to this conclusion for a couple of reasons. First, she saw the sensor that controlled the light. (Doc. 58-5, p. 19.) Second, she confirmed through discussions with personnel from the Avalon Police Department that the sensor was, in fact, a sensor that controlled the light, rather than a camera. (*Id.* at 19–20.) Finally, the fact that the light never turned red on Ocean Drive during the investigation—since no vehicle approached the light on 25th Street due to road closure—confirmed to Detective Falciani that the light was controlled by a sensor. (*Id.* at 20.)

Next, Defendant's proffer the expert report of Shawn Harrington ("Harrington"), an accident reconstruction expert.  (Doc. 58-4.)  The expert report makes several relevant conclusions with respect to the stoplight.  First, the report found that Detective Falciani's understanding about how the stoplight works "is consistent with the traffic signal sequencing data" that Defendants received in discovery.  (*Id.* at 27.)  That sequencing data states, "[i]f no actuation occurs, signal to rest in Phase 1 (Ocean Avenue [sic] ROW)."  (*Id.*)  Second, Harrington's report describes results from testing he did in April 2024 to determine if the presence of a bicycle at the intersection would trigger the stoplight to change on 25th Street.  (*Id.* at 28–29.)  The testing involved riding a bicycle on 25th Street towards the intersection and stopping at the "stop bar" for around a minute.  (*Id.*)  The testing included four tests heading eastbound and four tests heading westbound.  (*Id.* at 29.)  Two of the four tests in each direction were conducted with the bicycle traveling in the center of 25th Street, and the other two involved the bicycle traveling in the left-third of the road and the right-third of the road, respectively.  (*Id.*)  For all eight tests, the light never turned green for traffic on 25th Street.  (*Id.*)  Finally, Harrington observed that "[t]here was no evidence of a car or truck in the eastbound or westbound direction at the time of the [accident]."  (*Id.*)  Based on all of this information, Harrington concluded that "the signal for

Mr. Warren would have been red at the time of him entering the intersection and colliding with the vehicle driven by Mr. Saeed." (*Id.*)

Finally, Defendants point to Scully's recollection of how traffic was moving at the time of the accident. As noted above, Scully reported to law enforcement on the night of the accident that he believed traffic was moving northbound and southbound on Ocean Drive when he heard a collision. (Doc. 58-3, p. 12.)

Warren attempts to create a genuine dispute on this issue through his and Detective Sergeant Sykes's deposition testimony. First, Warren contends that Detective Sergeant Sykes testified that the stoplight at issue operated on a timer and was not sensor-controlled. (Doc. 63, p. 9.) In his brief, Warren represents that Detective Sergeant Sykes provided the following testimony in response to a question about whether the stoplight stays green for traffic on Ocean Drive unless a vehicle is on 25th street: "I don't believe so, no. The light cycles pretty regularly . . . I'm pretty sure [the light] cycles all night long even if there's no traffic coming [down 25th Street]." (*Id.* (quoting Doc. 62-5, p. 5.) (alterations in original)). Yet, Warren selectively quotes Detective Sergeant Sykes's testimony to make it appear that he stated with certainty how the stoplight operates. This is a blatant mischaracterization based on selective quoting. Detective Sergeant Sykes's full answer to the question was as follows:

> I don't believe so, no. The light cycles pretty regularly. *It could. I don't know. That would probably be a question for the Cape May County*

> *Road Department because they're well versed in those lights*, but I'm pretty sure it cycles all night long even if there's no traffic coming the other way.

(Doc. 62-5, p. 5 (emphasis added)). Detective Sergeant Sykes's full answer reveals that his belief on how the stoplight works was admittedly speculative. Such speculation cannot create a genuine issue of material fact. *Dellapenna v. Tredyffrin/Easttown Sch. Dist.*, 449 F. App'x 209, 215 (3d Cir. 2011); *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005); *Ziadeh v. Walmart Inc.*, No. 1:22-CV-00094, 2024 WL 23153, at *3 (M.D. Pa. Jan. 2, 2024).

Next, Warren insists that his testimony establishes that he has a habit of biking safely and obeying traffic signals. (Doc. 63, p. 6.) Specifically, Warren believes his answer to a question about how the accident impacted his life establishes such a habit:

> Just being at fault for something that you normally did and had done so many times in a very busy city like New York City. Being able to read traffic lights. Being able to do all of these things that I've done with no issue in one of the most populated areas in the United States of America and also doing it while living in China, in Chongqing, China which is one of the five major municipalities of China.
>
> And then being, you know, not directly told, but being looked at that I'm responsible has been interesting just from my past experiences in this and knowing myself. I look both ways before I cross a street. I look both ways before I bike. I have a track record of that.
>
> And I referenced in my last deposition I can pull up my City Bike metrics, but I biked over a thousand trips to and from work every single day. So that's been just some interesting things on my end just trying to quantify all this.

(Doc. 58-2, p. 21.)

Warren makes no argument as to why this testimonial evidence is admissible habit evidence under Federal Rule of Evidence 406. *See generally Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (explaining that "it is not proper to consider [inadmissible] evidence on summary judgment"). Conversely, Defendants argue that this testimony is not admissible habit evidence. (Doc. 64, pp. 9–12.) The court need not decide the issue of admissibility here. Even assuming, without deciding, that Warren's testimony is admissible as habit evidence, it does not create a genuine issue of material fact.

On this point, the court finds persuasive the analysis in *Gilliam v. McKnight*, No. 1:01CV00332, 2002 WL 31770488 (M.D.N.C. Dec. 4, 2002). In *Gilliam*, a plaintiff was driving across a railroad track that she had crossed every day for years when her car was struck by a train. 2002 WL 31770488, at *2–3. At issue, in relevant part, on summary judgment was whether the plaintiff's own negligence caused her injuries. Although there was no evidence that plaintiff looked both ways before crossing the tracks, she attempted to create an issue of material fact by claiming she had a habit of looking both ways before crossing the tracks. *Id.* at *5. The *Gilliam* court found no triable issue of fact. *Id.* Two witnesses testified that the plaintiff did not look both ways, and the plaintiff did not testify to the contrary nor could remember if she looked both ways before crossing the track. *Id.* The

*Gilliam* court concluded, "any evidence of 'usual' activity is irrelevant when contradicted by undisputed evidence of what actually happened the day of the collision." *Id.*

Here, Defendants have offered substantial evidence that Warren entered the intersection despite having a red light. Warren cannot remember what he did the night of the accident. (Doc. 58, ¶ 12.) He has offered nothing to rebut Defendants' evidence, except purported habit evidence. This is not enough to create an issue of material fact to survive summary judgment.

### 2. There is no genuine issue of material fact as to whether Saeed was negligent.

Warren further argues that there is a genuine issue of material fact as to whether Saeed acted negligently even if Saeed had a green light on Ocean Drive. (Doc. 63, p. 10–12.) Specifically, Warren contends that "it is for the jury to decide whether Mr. Saeed's actions of entering an intersection with a clear and unobstructed view of opposing traffic and failing to pay attention to said traffic was [negligent]." (*Id.* at 11.) In support of his position, Warren points to several pieces of evidence showing that the intersection was well lit at the time of the accident and that there was an unobstructed view of eastbound traffic on 25th Street from Ocean Drive. Detective Sergeant Sykes testified that he did not see anything that would have obstructed a driver's view of 25th Street coming down Ocean Drive. (Doc. 62-5, p. 4.) Detective Falciani testified to that same effect.

(Doc. 62-7, p. 3.)  Similarly, both Saeed and Detective Falciani testified that there was an operational streetlight at the intersection.  (*Id.* at 6; Doc. 62-11, p. 3.) Arguably this evidence shows that Saeed could have and, perhaps, should have seen Warren on 25th Street.  Even so, this is not enough to establish Saeed was negligent.

That is because Warren must also show that Saeed could have and should have *prevented* the accident from occurring.  *See Mitchell v. Milburn*, 199 A.3d 995, 1002 (Pa. Commw. Ct. 2018) (quoting *Butler v. City of Pittsburgh*, 537 A.2d 112, 114–15 (Pa. Commw. Ct. 1988)) ("In Pennsylvania, it is well-settled that 'the mere happening of an accident is no evidence of negligence' and 'conduct is negligent only if the harmful consequences thereof could reasonably have been foreseen and prevented.'"); *see also Ridgway Nat'l Bank v. N. Am. Van Lines, Inc.*, 326 F.2d 934, 937 n.5 (3d Cir. 1964) ("Both so-called 'pure' accidents and unavoidable accidents are properly embraced in the proposition that the mere happening of an accident does not mean someone was negligent."); *Bloom v. Bailey*, 141 A. 150, 152 (Pa. 1928) (explaining that "drivers are not to be held liable where their only proven fault is inability to avoid a collision, under circumstances which are unusual and not likely to be anticipated").  A finding that Saeed was negligent regardless of whether he could have avoided the accident would wrongly conflate negligence and strict liability.  *See Sullivan v. Werner Co.*,

306 A.3d 846, 863 (Pa. 2023) ("Strict liability remains distinct from negligence in that it imposes liability without fault.")

Harrington's expert report squarely addresses this issue. Harrington evaluated the reaction time necessary to avoid the accident based on the speed of Saeed's vehicle and Warren's bicycle. Harrington considered scenarios in which Saeed's vehicle was traveling 20 miles per hour, 25 miles per hour, or 30 miles per hour. (Doc. 58-4, p. 25.) This is consistent with Saeed's statements concerning his speed entering the intersection. (*Id.* at 21.) For each vehicle speed, Harrington evaluated scenarios in which Warren's bicycle was traveling 10 miles per hour and 20 miles per hour, respectively, for a total of six scenarios. (*Id.* at 25.) Harrington estimated the speed of Warren's bicycle based on his experience, average bicycle speeds for men, and the damage Warren's bicycle sustained. (*Id.* at 22.) Harrington concluded the following based on his analysis and "mathematical equations derived from a meta-analysis of previously published research and naturalistic driving experiments." (*Id.* at 25):

> In a conservative scenario with the van operated by Mr. Saeed traveling at or below the speed limit, more than 90% of drivers would have been unable to avoid a collision with the bicycle had the bicycle been traveling at 10 mph per hour [sic] prior to impact. The collision would have been completely unavoidable if the bicycle had been traveling at 20 miles per hour or faster.
>
> Fewer than 10% of drivers would have reacted quickly enough to avoid a collision in the two scenarios evaluated in which an effective evasive

braking maneuver was even possible.  These require either top-ten percentile of top-five percentile responses.

(*Id.* at 34.)  Since Warren offers no rebutting evidence that Saeed realistically could have avoided the accident, there is no genuine issue of material fact on this issue.  Warren's evidence concerning Saeed's purported unobstructed view and the illumination of the intersection is insufficient to defeat Defendants' summary judgment motion.

### C. This case does not require credibility determinations to be made by a jury.

Warren insists throughout his brief that this case must be tried before a jury because credibility determinations are necessary.  For instance, Warren categorically argues, "[a]ll of the evidence cited by Defendants in support of [their position concerning who had the right of way] is subject to a credibility determination that can only be made by our jury."  (Doc. 63, p. 7.)  Similarly, Warren states that Harrington's "opinion is subject to a credibility determination by our jury."  (*Id.* at 9.)  As a general matter, Warren is wrong.

The mere fact that a jury may disbelieve Defendants' evidence is not a reason to deny their summary judgment motion.  *Cf. Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998) (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)) ("It is by now axiomatic that 'a nonmoving party . . . cannot defeat summary judgment simply by asserting that a

jury might disbelieve an opponent's affidavit to that effect.'" (alterations in original)).  Indeed, credibility determinations are only necessary when there is a genuine issue of material fact.  *Id.*  Here, the court has found no genuine issue of material fact.  Thus, no credibility determination by a jury is required to resolve this case.

### D. Defendants' reliance on expert opinion does not undermine their motion for summary judgment.

More specifically, Warren takes exception with Defendants' reliance on an expert report in support of their motion for summary judgment, because the jury is free to reject their expert's opinions.  Warren's argument raises a question about the propriety of considering expert reports on summary judgment.  Chief Judge Mark R. Hornak of the Western District of Pennsylvania aptly explained that "the use of expert reports at the summary judgment stage lies at the intersection of two doctrines that appear to be in tension."  *Estate of Thomas v. Fayette County*, 194 F. Supp. 3d 358, 365 (W.D. Pa. 2016).  The first is the rule that a nonmoving party, in order to survive summary judgment, "must present some actual record evidence to contravene the moving party's supported assertion."  *Id.*  The second is the well settled principle that "the trier of fact is not bound to accept expert opinion, even if it is uncontradicted."  *Id.* (quoting *Minn. Mining & Mfg. Co. v. Berwick Indus., Inc.*, 532 F.2d 330, 333 (3d Cir. 1976)).

On this issue, the Supreme Court found summary judgment inappropriate when the moving party relied only upon expert opinions from individuals interested in the outcome of the case. *Sartor v. Ark. Nat. Gas Corp.*, 321 U.S. 620, 627–28 (1944). The issue in *Sartor* upon which the experts opined was the market price of natural gas. *Id.* at 623. In finding summary judgment unwarranted, the *Sartor* Court explained, "if the court admits the [expert opinion] testimony, then it is for the jury to decide whether any, and if any what, weight is to be given to the testimony." *Id.* at 627 (quoting *Cong. & Empire Spring Co. v. Edgar*, 99 U.S. 645, 658 (1878)). It further noted, "the jury, even if such [expert opinion] testimony be uncontradicted, may exercise their independent judgment." *Id.* at 627–28 (quoting *The Conqueror*, 166 U.S. 110, 131 (1897)).

This court agrees with Judge Hornak that *Sartor* does not prohibit *per se* the consideration of expert opinions at summary judgment. *Estate of Thomas*, 194 F. Supp. 3d at 367. As *Estate of Thomas* noted, key to the Supreme Court's analysis was the fact that the expert opinions were "inconclusive," due to the experts' interest in the case, and thus required credibility determinations by the jury. *Id.* If the opinion evidence was "given conclusive effect," the *Sartor* court explained, it would have been sufficient to "sustain the [summary judgment] motion." *Sartor*, 321 U.S. at 624. Based on this reasoning, the court agrees with Judge Hornak that "*Sartor* may not preclude the consideration of experts in all summary judgment

situations, but rather only those in which the expert is part and parcel of an interested party." *Estate of Thomas*, 194 F. Supp. 3d at 367.

The Third Circuit also commented on this issue in *United States v. Donovan*, 661 F.3d 174 (3d Cir. 2011). In *Donovan*, a Clean Water Act case, the government moved for summary judgment and relied upon expert reports concerning how the nonmovant's property affected the "chemical, physical, and biological integrity of 'waters of the United States.'" 661 F.3d at 187. The *Donovan* court rejected the nonmovant's argument that summary judgment was inappropriate because a jury could reject the opinions of the government's experts. *Id.* at 188. In doing so, the Third Circuit distinguished *Sartor* on the basis that "the *factual* evidence offered by the Government . . . [was] enough to meet its burden of production for a [summary judgment] motion." *Id.* (emphasis in original). *Donovan* seemingly makes a distinction between factual evidence contained in an expert report and opinion evidence. But, like Judge Hornak, this court does not read *Donovan* to proscribe the consideration of opinions in expert reports on summary judgment when those opinions are unrebutted. *Estate of Thomas*, 194 F. Supp. 3d at 367; *see Stiso v. State Farm Fire & Cas. Co.*, Civil No. 13-5741, 2015 WL 7296081, at *8–9 (D.N.J. Nov. 18, 2015) (relying on movant's expert opinion to grant summary judgment when nonmovant failed to offer any expert or evidence to rebut movant's expert opinion).

Taking *Sartor* and *Donovan* together, Judge Hornak synthesized the following rule:

> [A]n unopposed, favorable expert report will not automatically win a summary judgment motion for a moving party. However, consistent with *Donovan*, the expert report may allow a moving party to fulfill its initial burden of showing that the nonmoving party has failed to support its claim or failed to introduce a genuine issue of material fact necessitating a trial; such a showing requires the nonmoving party to come forward with specific record evidence to show why a trial is necessary.

*Estate of Thomas*, 194 F. Supp. 3d at 368. The court agrees with Judge Hornak's analysis. Applying this rule, Warren has plainly failed to point to any record evidence to rebut Harrington's opinion or any of the evidence Defendants proffered in support of their motion. Thus, summary judgment is appropriate.

### E. Warren's intoxication level does not create a genuine issue of material fact.

In his brief in opposition, Warren argus that the court should deny Defendants' motion for summary judgment because a genuine issue of material fact exists as to his intoxication level on the day of the accident. (Doc. 63, p. 14.) Such a dispute, if one exists, would be relevant to whether Warren was negligent, not Saeed. In other words, it would be relevant to Defendants' affirmative defenses that Warren's recovery should be barred or diminished by his own negligence. (Doc. 31, p. 6; Doc. 32, p. 10). However, Defendants need not prove their affirmative defenses, because Warren has failed to satisfy his *prima facie*

burden.  *See Gumbs v. Del. Dep't of Lab.*, Civil No. No. 15–190–RGA–MPT, 2017 WL 2538568, at *3 (D. Del. June 12, 2017) ("Only after a plaintiff carries her burden of establishing a prima facie case does the burden shift to the defendant to demonstrate an affirmative defense."), *R. & R. adopted*, 2017 WL 3475711 (D. Del. Aug. 11, 2017), *aff'd*,  745 F. App'x 457 (3d Cir. 2018).  Accordingly, a dispute over Warren's intoxication levels would not defeat Defendants' summary judgment motion.

## CONCLUSION

For the foregoing reasons, there are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law.  Therefore, the court will grant Defendants' motion for summary judgment.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: May 15, 2025